UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **PHILLIP JACKSON, individually and on behalf of all other similarly situated,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04 C 1805** |
| **NATIONAL ACTION FINANCIAL SERVICES, INC., a Georgia corporation,** | ) | **Judge Ruben Castillo** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Phillip Jackson has brought a class action lawsuit against National Action Financial Services, Incorporated ("NAFS") alleging that NAFS violated Section 1692e of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692o, by making "false, deceptive, or misleading statements" in its offers to settle the class's debt. NAFS sent members of the class substantially similar letters ("the NAFS letters") offering to settle their debt for a percentage of their obligation and stating that "in order to take advantage of this offer, your payment must be received in our office" by a specific date. (R. 9, Am. Compl. ¶ 5.) Jackson claims that this language violates the FDCPA because NAFS later made better offers to class members and was always willing to settle debts for the percentage cited in the letters even if payment was made after the specified date. (*Id.* ¶ 9.) Currently before the Court are the parties' cross motions for summary judgment, (R. 63-1, R. 69-1), and NAFS's motion to bar Jackson's expert under *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, 509 U.S. 579 (1993), (R. 72-1). For the reasons that follow, we must grant both of NAFS's motions.

## BACKGROUND

On July 20, 2004, NAFS moved to dismiss Jackson's amended complaint, arguing that the NAFS letters were neither false nor misleading under the FDCPA. (R. 10, Def.'s Mot. to Dismiss at 4.) This Court denied NAFS's motion to dismiss the amended complaint because it was possible that "an unsophisticated consumer would have believed that he *must* accept the offer before the deadline" to receive the advantageous rate and thus the letters "could have created a 'false sense of urgency' in an unsophisticated consumer." (R. 18, 11/10/04 Order at 3, 5.) We allowed discovery to proceed in this case to resolve that issue. On April 11, 2005, this Court certified the following class:

> [a]ll persons similarly situated in the State of Illinois from whom Defendant NAFS attempted to collect a consumer debt allegedly owed to Capital One, from one year before the date of th[e] Complaint to the present, and as to which the consumer was sent a purported limited settlement offer letter similar to the letters [Jackson] received.

*See Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 286 (N.D. Ill. 2005).

Jackson filed a motion for summary judgment on behalf of the class on February 21, 2006. In support of the summary judgment motion, Jackson proffered the opinion of an expert witness, Howard Gordon, which is based on a mall intercept survey that Gordon designed and implemented.[1] NAFS has moved to bar Gordon's opinions, arguing that they are unreliable and irrelevant. This Court will first address NAFS's motion to bar the class's expert before turning to the cross motions for summary judgment.

---

[1]The mall intercept survey method involves questioning anonymous individuals at a shopping mall. In this case the survey was conducted at the Orland Square Mall in Orland Park, Illinois. (R. 65, Pl.'s Facts, Ex. K, Gordon Aff. ¶ 16.)

## NAFS'S MOTION TO BAR PLAINTIFF'S EXPERT

### I. Legal Standards

Under the Federal Rules of Evidence, an expert may provide opinion testimony based on his "knowledge, skill, experience, training, or education" where: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. It is this Court's obligation to serve as a gate-keeper to ensure that only evidence that is both relevant and reliable is admitted. *Daubert*, 509 U.S. at 589; *Chapman v. Maytag Corp.*, 297 F.3d 682, 686 (7th Cir. 2002).

Expert testimony is considered relevant where it has a sufficient connection to the facts and issues of the case to assist the trier of fact in performing its fact-finding duties. *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). Expert testimony is considered reliable where the expert is qualified to testify and the opinion is based on sound principles and methodology. Fed. R. Evid. 702; *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). The Court has broad latitude to decide how to determine reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999). In making the reliability determination, we consider whether the expert's opinion has been subjected to the scientific method and we exclude any testimony that is based on "subjective belief or unsupported speculation." *Deimer*, 58 F.3d at 344 (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

### II. Analysis

NAFS argues that the consumer survey which provides the basis of the expert's opinion is neither relevant nor reliable because it: (1) fails to identify and question the appropriate target

population of consumers; (2) asks questions that have no relevance to the resolution of this matter; and (3) asks questions that are unnecessarily vague and confusing.[2] (R. 72, Def.'s Mem. at 2, 7-8.) We will consider these arguments in turn below.

### A. Target Population

To demonstrate that the settlement letters violate the FDCPA, Jackson must show that they are misleading to the "unsophisticated consumer or debtor." *Sims v. GC Servs., L.P.*, 445 F.3d 959, 963 (7th Cir. 2006) (quoting *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005)). The FDCPA defines "consumers" as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). A debt is defined under the FDCPA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *Id.* § 1692(a)(5). The Seventh Circuit defines the "unsophisticated consumer" for FDCPA purposes as one who "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is capable of making basic logical deductions and inferences." *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000).

---

[2]NAFS does not challenge Gordon's qualifications as an expert, and this Court is satisfied that Gordon has sufficient experience and credentials to qualify as an expert in marketing and consumer research. (*See* R. 65, Pl.'s Facts, Ex. K-1, Gordon Curr. Vitae.)

### 1. Reliability

NAFS argues that the survey at issue here is insufficiently reliable because it fails to properly identify consumers—and in particular, unsophisticated consumers—as the target population. (R. 72, Def.'s Mem. at 2-6.) Surprisingly, Gordon did not consider the FDCPA definition of "consumer" in formulating his opinion; he testified that he uses the term "consumer" in his reports as a generic term and that "[e]verybody is a consumer." (R. 72, Def.'s Mem., Ex. 2, Gordon Dep. at 110.) Nor was the FDCPA definition incorporated into the survey-screening process. Although survey participants were asked during screening whether they use a credit card or store credit when they shop, participants were not excluded from participation if they answered in the negative. (R. 81, Pl.'s Resp. at 9 n.8.) With respect to the "unsophisticated consumer" standard, the survey targets "consumers with a twelfth grade education or less." Gordon testified, however, that this group is "[n]ot necessarily" unsophisticated; rather, he targeted this group "to move this survey forward in as valid and a reliable a fashion as possible." (R. 72, Def.'s Mem., Ex. 2, Gordon Dep. at 93-94.)

We agree that the imprecision with which the target population was obtained casts doubt on the reliability of the survey's outcome. The survey was not tailored to exclude individuals who are not consumers within the meaning of the FDCPA. Gordon should have considered the definition of "consumer" under the Act in some manner rather than relying on his unsupported assumptions. *See Chapman*, 297 F.3d at 687 (noting that a court considering whether expert testimony reflects scientific knowledge should rule out "unsupported speculation").

### 2. Relevance

Additionally, Gordon's testimony casts doubt on the survey's relevance to whether the NAFS letters are misleading to unsophisticated consumers. While he testified that he targeted people with a twelfth grade education or less because these are the people he understood to be addressed by the FDCPA, he did "[n]ot necessarily" assume that those people are unsophisticated. (R. 72, Def.'s Mem., Ex. 2, Gordon Dep. at 89, 93-94.) The "unsophisticated consumer" is a hypothetical construct which makes it necessary to choose objective proxies for levels of sophistication. *Gammon v. GC Consumer Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). Gordon's testimony, however, indicates that he did not necessarily consider education to be a proxy for sophistication. This casts doubt on whether the survey was properly tailored to target the relevant population. *See, e.g., White v. Fin. Credit Corp.*, 99-C-4023, 2001 WL 1665386, *2-3 (N.D. Ill. Dec. 27, 2001) (finding that a professor's survey of his students, whom he considered "not really sophisticated consumers, but certainly [of] above average intelligence," "falls far short of reliable survey principles and methods").

Though this lack of precision is troubling, it is not fatal. Extrinsic evidence that a letter is confusing to a significant portion of the population is relevant to whether it is confusing to the "unsophisticated consumer." *Durkin*, 406 F.3d at 422-23. Thus, the fact that Gordon did not use a proxy for sophistication does not itself render the survey inadmissible. Moreover, given the breadth of the definition of "consumer" and the difficulty of isolating "unsophisticated consumers" under the FDCPA, the reliability and relevance problems we have outlined above, standing alone, are not sufficient to warrant exclusion of the survey under *Daubert*. We must consider these weaknesses, however, in conjunction with the additional issues outlined below.

### B. "Limited Time Offer" Question

Jackson and the class rely on Gordon's opinion and the underlying survey to support their theory that the NAFS letters "deceive and mislead consumers to believe that the offer is only available for a limited time, when, in fact it was always available." (R. 64, Pl.'s Summ. J. Mem. at 12.) The key survey question that addresses this issue reads as follows:

> Please look at the letter again. Let's say the person getting this letter does not accept the settlement offer by the deadline date. Do you think that person would feel it is a limited-time offer, or it is not a limited-time offer?

(R. 65, Pl.'s Facts, Ex. K-4, Survey Report at 22.) Based on the survey participants' response to this question, Gordon renders an opinion that "a significant percentage of consumers with a high school education or less perceive the letter's message to be that the proposed settlement opportunity is a limited-time offer." (*Id.*, Ex. K, Gordon Aff. ¶ 34.)

#### 1. Reliability

NAFS argues that the survey is insufficiently reliable because the key question cited above is "subject to multiple and varied meanings to different respondents." (R. 72, Def.'s Mem. at 8.) We agree. Though the key survey question turns on whether the letter represents a "limited time offer," the survey participants were not given a definition of that term during the survey process and it is unclear whether they had a uniform understanding of that term's meaning. Gordon testified that the participants understood what was meant by "limited-time offer," but he came to this conclusion simply because "they answered the question." (R. 72, Def.'s Mem., Ex. 2, Gordon Dep. at 135-37.) Gordon's conclusion that the survey participants understood the question thus is based solely on his unsupported presumption.

The phrase "limited-time offer" as used in the survey—without any definition or

explanation—is simply too ambiguous to provide any insight into whether the participants were confused as to the meaning of the offer presented in the NAFS letters. The United States District Court for the Southern District of Indiana recently addressed this problem in a case involving essentially the same survey. *Headen v. Asset Acceptance, LLC*, 04-C-2016, 2006 WL 839482, *3 (S.D. Ind. Mar. 28, 2006). The key question in the survey at issue in *Headen* asked the participants whether they believed someone reading the letter would feel it is a "one-time offer." Noting the inherent ambiguity in this question, the Court noted:

> The phrase in the survey question (it is *not* in the letter) could mean that the letter makes only one offer and is simply silent as to whether it might be extended and/or whether any other offer might be made in the future. The phrase "one-time offer" could also mean that the offer will never be extended and that no other offer will ever be extended in the future.

*Id.* at *3 (emphasis in original). This observation holds true with respect to the phrase "limited-time offer," which appears in the survey question at issue here but does not appear in the NAFS letters. The question that the survey participants should have resolved to support Jackson's theory of liability is whether if the participants received the letter they would have believed that they must accept the offer before the deadline or forever lose the opportunity. The question as phrased here simply does not resolve the issue of whether the participants thought the advantageous offer would only be available until the deadline and never again. The survey respondents may have believed that the letter's recipient would feel that they had to respond by the deadline to take advantage of *this particular* offer. It sheds no light on whether they were misled to believe that NAFS would never make additional or better offers.[3]

---

[3]Gordon's own testimony reinforces this ambiguity. He testified that he is not sure whether there is a difference between a limited-time and a one-time only offer. (R. 72, Def.'s (continued...)

### 2. Relevance

This ambiguity brings us to the other major deficiency with this survey question. Gordon's report indicates that "[t]he purpose of the survey sampling was to measure whether consumers with a 12th grade education of [*sic*] less perceive and interpret a debt collection letter that offered a settlement opportunity as a limited-time offer or not." (R. 65, Pl.'s Facts, Ex. K, Gordon Aff. ¶ 11.) Accordingly, the survey isolated individuals with a twelfth grade education or less as the relevant respondents for the treatment group. (*Id.*) The key survey question, however, does not ask this group whether *they* think that the NAFS letters represent a limited-time offer. Instead, the question asks whether "*the person getting this letter*" would "feel" that it is a limited-time offer or not. (R. 65, Pl.'s Facts, Ex. K-4, Survey Report at 22 (emphasis added).) Whether a purportedly unsophisticated consumer thinks some other unidentified person would feel that the letter is a limited-time offer does not provide us with an answer to whether the survey participants themselves were confused by the letter.

When this Court considers the imprecision with which the survey at issue here was designed—both with respect to its target population and especially with respect to the drafting of the key question—we find that the methodology underlying the proffered expert testimony is insufficiently reliable to justify submitting the testimony to a trier of fact. *See Daubert*, 509 U.S. at 592. We cannot find that the principles and methods underlying the consumer survey were applied to the facts of this case reliably, as Rule 702 requires. We also find that the key question

---

[3](...continued)
Mem., Ex. 2, Gordon Dep. at 139.) We certainly cannot presume that the purported "unsophisticated consumers" targeted by the survey would grasp this distinction where the expert who designed the survey did not.

was drafted in such a way as to render it irrelevant to the issue in this case: whether the NAFS letters are impermissibly confusing or misleading under the FDCPA. Accordingly, the Court's gate-keeper discretion under *Daubert* requires that we grant NAFS's motion to bar Gordon's opinion. (R. 72-1.)

## MOTION FOR SUMMARY JUDGMENT

### I. Relevant Facts

The relevant facts in this case largely are undisputed. NAFS is a Georgia corporation that acts as a debt collector as defined by Section 1692a of the FDCPA. (R. 71, Def.'s Resp. to Pl.'s Facts ¶ 4.) Jackson is a citizen of Illinois from whom NAFS attempted to collect a debt. (*Id.* ¶ 3.) On November 3, 2003, NAFS sent Jackson a collection letter, which offered to settle Jackson's debt for 75% of the balance owed. (*Id.* ¶ 5.) The letter read in pertinent part:

> WE HAVE BEEN AUTHORIZED TO OFFER YOU A SETTLEMENT ON THE ABOVE REFERENCED ACCOUNT. IN ORDER TO TAKE ADVANTAGE OF THIS OFFER, YOUR PAYMENT MUST BE RECEIVED IN OUR OFFICE ON OR BEFORE THE DATE LISTED BELOW. SEND YOUR CHECK OR MONEY ORDER IN THE ENCLOSED ENVELOPE ALONG WITH THE TOP PORTION OF THIS LETTER. IN THE EVENT THAT YOU ARE UNABLE TO MAKE THE SETTLEMENT PAYMENT WITHIN THE TIME FRAME INDICATED, CALL OUR OFFICE PRIOR TO THE DEADLINE DATE. IT MAY BE POSSIBLE TO EXTEND THE DEADLINE UNDER CERTAIN CIRCUMSTANCES.
>
> YOU ACTUALLY OWE: $1335.73
> SETTLEMENT AMOUNT: $1001.80
> AMOUNT MUST BE RECEIVED BY: Dec 03 2003

(*Id.*) On December 31, 2003, NAFS sent Jackson a letter offering to settle his debt for 50% of the balance if NAFS received payment by January 30, 2004. (*Id.* ¶ 6; R. 65, Pl.'s Facts, Ex. D, Settlement Letter.)

At the time that NAFS sent its offer to settle Jackson's debt for 75% of the outstanding

balance, NAFS had blanket authority to settle for as little as 50% of the full balance owed. (R. 71, Def.'s Resp. to Pl.'s Facts ¶ 8.) At the time NAFS sent its offer to settle the debt for 50% of the outstanding balance, NAFS had blanket authority to settle the debt for 40% of the full balance owed. (*Id.* ¶ 9.) NAFS sent similar letters to other members of the class. NAFS also sent a third letter to some members of the class, offering to settle their debts for 40% of the outstanding balance before the deadline had expired to the previous offer to settle for 50% of the full balance owed. (*Id.* ¶¶ 10-11.)

Ingrid James, who works in client relationship management at NAFS, testified that she had the authority to settle debts for less than 40% of the balance subject to certain parameters. (*Id.* ¶ 9; R. 65, Pl.'s Facts, Ex. E, James Dep. at 8-9.) James further testified that if a debtor such as Jackson offered to settle a debt after the deadline set forth in the NAFS letter expired, NAFS "may have and may not have" accepted the offer. (*Id.* ¶ 13; R. 65, Pl.'s Facts, Ex. E, James Dep. at 67.) She stated that several factors affected this decision, including whether the customer used profane language or refused to provide personal information. (*Id.*) Ms. James could not provide a specific example of a case in which NAFS rejected as untimely a class member's offer to settle a debt. (*Id.*) She testified that in at least one instance, NAFS accepted a class member's offer settle his debt for 40% of the balance owed after the deadline set forth in his letter expired, despite the fact that he used profanity and became irate with the debt collector. (*Id.* ¶ 14.)

Jackson and three other members of the class have submitted affidavits stating that they received collection letters from NAFS similar to those described above. (*Id.* ¶ 15.) They aver that they understood the letters to make an offer to settle their debts for an amount less than they actually owed, but that the offer was only available for a limited time and required payment

before the date set forth in the letter. (*Id.*) After that date, the class members believed they would have to pay the full balance owed.[4] (*Id.*)

## II. Legal Standards

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In resolving a summary judgment motion, the Court will neither decide factual disputes nor weigh conflicting evidence, but instead will limit its inquiry to whether a genuine issue of material fact exists for trial. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). When considering cross-motions for summary judgment, this Court will make all inferences in favor of the party against whom the motion under consideration is made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003). The non-moving party, however, is obligated to present specific facts demonstrating that there is a genuine issue for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III. Analysis

Jackson argues that the class is entitled to summary judgment because the NAFS settlement letters are both literally false and also deceptively confusing to "virtually all consumers." (R. 64, Pl.'s Summ. J. Mem. at 2.) NAFS argues that it is entitled to summary

---

[4]The remainder of the facts submitted by Jackson pertain to Gordon's survey and opinion, and for the most part they are disputed by NAFS. Because we have excluded Gordon's opinion and survey, we need not consider any facts relating to them in resolving the cross-motions for summary judgment.

judgment because the letters are not false on their face and because Jackson's extrinsic evidence of consumer confusion is insufficient to create a genuine issue of material fact for trial. (R. 69, Def.'s Summ. J. Mem. at 2-3.)

**A. Are the NAFS Letters Literally False?**

Section 1692e precludes a debt collector from making "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Jackson argues that the letters are false in violation of Section 1692e of the FDCPA because they misstate the extent and duration of NAFS's actual settlement authority. (R. 64, Pl.'s Summ. J. Mem. at 2.) Specifically, Jackson argues that by including a deadline in its settlement offer, NAFS indicated that the offer was only available until that deadline which was proven false when NAFS sent a second, better settlement offer after that deadline. (*Id.*) Additionally, Jackson asserts that NAFS misrepresented the extent of its settlement authority because it is undisputed that NAFS was authorized to settle the debts for less than 75% during the time period indicated in the first letter and for less than 50% during the time period indicated in the second letter. (*Id.*) For the reasons set forth below, we find that the NAFS letters are not false on their face.

**1. Duration of Offer**

We allowed Jackson to proceed beyond the motion to dismiss stage because we had to assume the truth of Jackson's allegation that the settlement offers set forth in the NAFS letters were not of limited duration. (*See* R. 18, Mem. Op. & Order at 4.) At the summary judgment stage, however, Jackson is obligated to set forth specific evidence demonstrating that the deadlines are false. *Allen*, 351 F.3d at 311. To meet this obligation, Jackson has submitted

evidence that NAFS accepted settlements for the reduced amount outside of the time period set forth in the NAFS letters. (R. 64, Pl.'s Summ. J. Mem. at 7; R. 65, Pl.'s Facts ¶¶ 12-14.) Jackson has also presented evidence that class members were sent settlement offers for 40% of their debt before the deadline expired on NAFS's offer to settle their debts for 50% of the outstanding balance. (*Id.* at 8; R. 65, Pl.'s Facts ¶¶ 10-12.)

None of the evidence that Jackson presents demonstrates that the deadlines set forth in the NAFS letters were false within the meaning of the FDCPA. The fact that NAFS was willing to settle for less after the deadline expired or made a second, better offer during the first offer period does not indicate that there was not a deadline attached to the first offer. Under black letter contract law, an offer may set a time limit for acceptance of the offer, and the offeree's power to accept that offer expires when the time limit runs out. 1 Williston on Contracts § 5:5 (4th ed. 2006). The fact that NAFS sent a second settlement offer after class members did not accept its first offer does not indicate that the deadline on the first offer was false; it simply indicates that NAFS decided to make a new offer. That principle is equally true with respect to Jackson's evidence that NAFS occasionally made second, better offers within the initial deadline period. Moreover, the fact that NAFS accepted some settlements after the deadline expired simply demonstrates that the class member made a counter-offer which NAFS accepted. *See* Restatement (Second) of Contracts § 39/2 (1981). If Jackson had brought forth evidence showing that NAFS was unwilling to settle for the proposed amount during the deadline periods expressed in the settlement letters, that may have demonstrated that the deadlines were false. It is undisputed, however, that NAFS was willing to settle for the proscribed amounts within the deadline periods set forth in their letters. Accordingly, the letters are not false on their face.

Jackson relies heavily on *Goswami v. American Collections Enterprise, Inc.*, 377 F.3d 488 (5th Cir. 2004)—a case which triggered the filing of a stream of similar lawsuits across the country—to support his argument that NAFS's willingness to settle the debts after the deadlines renders what he describes as a "limited-time offer" false. (R. 64, Pl.'s Summ. J. Mem. at 5.) The defendant in *Goswami* issued a form collection letter that stated "[e]ffective immediately, and only during the next thirty days, will our client agree to settle your outstanding balance due" with a certain percentage discount. 377 F.3d at 492. In reversing the district court's grant of summary judgment for the defendant, the Fifth Circuit stressed that the phrase "only during the next thirty days" rendered the letter false, because the defendant was actually authorized to settle for less at any time. *Id.* at 495. While Jackson argues that there is no practical difference between the letters at issue here and in *Goswami*, the vast majority of courts to address this issue have limited the *Goswami* holding to cases where a letter contains an explicit statement that the letters were one-time-only offers. *See, e.g.*, *Hernandez v. AFNI, Inc.*, 428 F. Supp. 2d 776, 780-81 (N.D. Ill. 2006); *Hancock v. Receivables Mgmt. Solutions, Inc.*, 06-C-1365, 2006 WL 1525723, *3 (N.D. Cal. May 30, 2006); *Headen*, 2006 WL 839482 at *1; *Gully v. Van Ru Credit Corp.*, 381 F. Supp. 2d 766, 772 (N.D. Ill. 2005); *Headen v. Asset Acceptance, LLC*, 04-C-2016, 383 F. Supp. 2d 1097, 1104-05 (S.D. Ind. 2005); *Johnson v. AMO Recoveries*, 05-C-0273, 427 F. Supp. 2d 953, 956 (N.D. Cal. 2005); *Kiliszek v. Nelson, Watson, & Assoc., LLC*, 04-C-2604, 2006 WL 335788, *6 (M.D. Penn. Feb. 14, 2004); *Kahen-Kashani v. Nat'l Action Fin. Servs.*, 03-C-828A, 2004 WL 2126707, (W.D. N.Y. Sept. 21, 2004). Here, there is no explicit statement that the NAFS settlement offer was "one-time-only" or even a "limited-time offer." In fact, the disputed letter expressly indicates that it may be possible to extend the deadline. Accordingly, *Goswami*

does not support Jackson's argument that the NAFS letters are literally false with respect to the offers' duration. Instead, Jackson is left with the impossible task of circumventing all of the above-listed authorities, which this Court concludes are well-reasoned.

**2. Extent of the Offers**

Jackson also argues that the NAFS letters are literally false because NAFS had blanket authority to settle debts for an amount less than the offer made in each of the NAFS letters. (R. 64, Pl.'s Summ. J. Mem. at 7.) Jackson does not dispute that NAFS actually was willing to settle the debts for the amounts stated in the letters. If Jackson is correct that an offer with a deadline is false if the offeror later makes a better offer, then the only way that a debt collector could avoid violating the FDCPA would be to make its best and final offer the first time it offers to settle a debt. The predictable outcome of such a regime would be that debt collectors simply would stop negotiating to settle debts for less than the full amount. That outcome ultimately would harm consumers in contravention of the FDCPA's goals. Accordingly, we find that the NAFS letters are not literally false with respect to the extent of the offers.

**B. Extrinsic Evidence of Confusion**

We allowed Jackson the opportunity to proceed with discovery specifically to resolve the question of "whether an unsophisticated consumer would have believed that he *must* accept the offer before the deadline" set forth in the NAFS letters. (R. 18, Mem. Op. & Order at 3.) Because we have found that Gordon's opinion and the underlying consumer survey do not meet the *Daubert* standards, the only extrinsic evidence before the Court is the self-serving affidavits of Jackson and three members of the class. The Seventh Circuit has repeatedly stated that such testimony is insufficient to raise a genuine issue of material fact as to whether a collection letter

violates the FDCPA. *Taylor v. Cavalry Inv., L.L.C.*, 365 F.3d 572, 574-75 (7th Cir. 2004); *Petit*, 211 F.3d at 1061-62. Accordingly, we find that Jackson has not submitted evidence that the NAFS letters were confusing or misleading to the unsophisticated consumer that is sufficient to survive NAFS's motion for summary judgment.

Even if we had considered Gordon's testimony, that testimony would not change our conclusion here. While the Seventh Circuit has suggested that consumer surveys may be useful in the FDCPA context, it has emphasized that such surveys must be "carefully designed and conducted." *Durkin*, 406 F.3d at 415. We have found that the consumer survey underlying the proffered expert testimony does not qualify as such. First, the survey simply does not demonstrate that the NAFS letters are misleading to the unsophisticated consumer. Second, given the number of district court decisions issued around the country since our ruling on the motion to dismiss which have found that letters virtually identical to those at issue here do not violate the FDCPA, *see* page 15, *supra*, Jackson's burden to submit reliable evidence to the contrary is significant. Because Gordon's survey suffers from the significant reliability and relevance problems outlined above, his testimony would not be entitled to weight sufficient to demonstrate consumer confusion or even to create a genuine issue of fact necessitating a trial in this case. For all of these reasons, we deny Jackson's motion for summary judgment and grant NAFS's motion for summary judgment.

## CONCLUSION

We allowed Jackson to proceed with this class action beyond the motion to dismiss stage to determine whether evidence supports Jackson's contention that the NAFS letters are literally false or misleading to the unsophisticated consumer. For the reasons set forth herein, we grant NAFS's motion to bar Jackson's proffered expert on the issue of customer confusion. (R. 72-1.) Because Jackson has not demonstrated that the NAFS letters violate the FDCPA, we must deny his motion for summary judgment, (R. 63-1), and grant NAFS's motion for summary judgment, (R. 69-1). The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Defendant NAFS and against Plaintiff Phillip Jackson and the class he represents.

**ENTERED:**

**Judge Ruben Castillo**
**United States District Court**

**Dated: July 11, 2006**